PsARSorr, J.
dissentients. Eve Clement left her, surviving, a niece, the only child of her deceased brother Adam, and a niece and nephew, children of .her deceased brother Henry, and many great nieces and nephews, the children of four deceased children of her brother Henry:
Is the real estate to be divided into two equal parts, the child of Adam, taking one part, leaving the other part to be divided and subdivided among the children of ITenry who are *95 living, and the representatives of those who are dead? or is it to he divided into seven equal parts? — the two nieces and nephews taking each one part and the children of the four deceased nieces, and nephews, by classes or “p&r súripes,” each class taking one part?
.The question is an open one, for it has so happened, that the point has never before been presented to this Court for decision.
It is a principle founded on natural feeling, that upon the death of the owner, without making a disposition of it, his estate shall belong to his “next of kin.” It is also a principle, which, although subservient to the former, is likewise founded on natural feeling, that one should not he excluded from a share of the estate of his deceased kinsman, if by representing an ancestor he can bring himself up to an equality with those who are the “ next of kin.” Upon these two general principles the distribution of estates, both real and personal, is based as the “ corner stones.”
That the first is founded on natural feeling all concede. If one dies, leaving seven children, this feeling suggests that they should share his estate equally, because they are all his children, so if one leaves as his next of kin seven grand-children, the same feeling suggests that they should share his estate equally, because they are all his grand-children — equally near to him, and for that reason presumed to be equally the objects of his affection without reference to the fact that some of his children, all of whom are dead, were blessed with more children than the others; for our affections, and the law which follows them, deal with the living, not with the dead. This is the presumption always acted on unless there be something to show to the contrary. For the same reasons, if one leaves as his next of kin, seven nieces and nephews, natural feelin g suggests that they should share his estate equally, in the absence of anything to show that he intended to give a preference to those whose parents had the fewest number of children.
That the second is also founded on natural feeling all concede. If one dies leaving three children and many grandchildren by deceased children, nature suggests that the off *96 spring of the children who are dead, should not he excluded by the children who are living, with whom their parents, if living, would have been entitled to share — so if there be two nieces and a nephew and many children of four nieces and nephews who are dead, nature suggests that the children of the deceased nieces and nephews should represent them: In these cases, reference is made to the dead, not upon the idea that they had rights which were transmitted to their offspring, but upon the feeling that the offspring of the dead should not bo excluded by the living from the share to which their parents, if alive, would have been entitled as the equals of those who are living.
In regard to personal estate, these principles, both by the law of England and of this State, have full operation, with a single exception ■: among collaterals the right of representation is not admitted beyond brothers’ and sisters’ children: This is arbitrary, and was adopted to prevent, as far as possible, minute sub-divisions.
In regard to real estate, three considerations founded upon policy originating in the feudal system, are allowed by the laws of England, most materially to effect the operation of these principles, i. e. land should be kept in the blood of the first purchaser; males should be preferred to females: and the eldest son should alone inherit. Those much famed rules of that system are, from considerations of policy, so engrafted into the English Canons of descent, as to form their most prominent features, and cause them to be rules for findmg who a/mony the kmsmen of a dead tencmt is most fit to malm a good soldier, rather than rules of descent by which the estate shall devolve upon those most nearly connected to him by the ties of nature. In fact by that system, the property was considered as being in the sovereign and the tenant was seized “ as of fee” in consideration of performing services: But in the progress of civilization these' notions have changed and with us land is considered as the property of the individual, much the same as a horse or other thing. Accordingly, the rules of descent have assimilated very nearly to those by which personal property is distributed, and the two great lead *97 ing principles are permitted to operate witb but little restraint.
The policy of keeping land in the blood of tbe first purchaser, although retained, is greatly modified by our rules of descent, but it has no bearing upon our case : The claimants are all in the same line, so there is no conflict between the paternal and maternal lines, and the case is not complicated by the difference between descended and acquired land.
But the policy of preferring males to females, and of giving the whole real estate to the eldest son, is repudiated by our rules of descent, and the two English canons by which that policy was carried out are superseded by a rule putting females upon an equality with the males, and taking from the first born son any kind of preference. This is done expressly on the ground that the policy of the feudal system does not obtain here, and that natural feeling and justice require that there should be an equality among all the kinsmen of a deceased owner, who stand in equal degree.
These general remarks are made for the purpose of showing that the object of the Act of 1808, upon which we are to put a construction, has not been accomplished, if, according to that Act, one niece be entitled to one-half of the estate, while another niece who is also one of the “next collateral relations of the person last seized, and stands in equal degree ” with the former, is to receive only one-twelfth part. Any one will admit that all in equal degree ought to stand on the same footing, and that if the law be not so, it ought to be so ; and I will remark that if it is not so, it must be ascribed to a singular oversight in the framer of the Act of 1808, and that if, by using nearly the same words, in which the English canon, in regard to the right of representation is expressed, the necessary effect is to produce this inequality, then he marred his Own handy-work, and much will be taken from the meed of praise that has been heretofore universally accorded to him for framing an Act, which it was believed, relieved ns from all of the inequalities and peculiar effects of the English canons of descents, originating in the feudal system, and put our rules of descent upon the “great principles suggested by natural feeling and justice.”
*98 It is true this Court cannot make laws, but it is its duty to put a reasonable construction upon tlie laws that are made, and to enable it to do so, the obj ect for which a law is made should be taken into consideration, as well as the words in which it is expresssd.
The question depends upon the construction of the 4th and 5th rules of descent, “ on failure of lineal descendants, the inheritance shall descend to the next collateral relations of the person last seized subject to the 2nd and 3rd rules.” The 2nd is, females shall inherit equally with males and younger equally with other children. The 3rd is, “ the lineal descend-, ants of any person deceased, shall represent their cmcestor and stand in the same place as the person himself would have done, had he been living.”
"Who are the next collateral relations of Eve Clement ?— Her two nieces and nephew occupy that position on thei/r ownfootvng. The children of her deceased nieces and nephews occupy that position by the right of representing their parents — so her two nieces' and nephew, and the representatives of her deceased nieces and nephews are her next collateral relations subject to the 2nd and 3rd rules; ‘for the 2nd has its operation' — -females and younger children being put on equality with the eldest male; and the 3rd has its operation— the children of the deceased nieces and nephews being allowed to take the place of “ their ancestors.” I think it clear that this construction gives full force and effect to the words of the statute, and carries out its full meaning and intent. It is said this construction does not give to the 3rd rule full operation, and to do so, it is necessary for the two nieces and the nephew likewise to represent their ancestors as well as the great nieces and nephews; I ask for what reason are the nieces and nephews to be called on to take by representation? They are entitled on their own footi/ng as “ next collateral relations” of their aunt, and not as descendants of any person deceased, who must represent their ancestor in order to entitle themselves to a share. To this two replies are made. 1st. The 3rd rule uses the words shall represent their ancestor, so it can make no difference whether it is necessary *99 for them to do so in order to gain an equality witb others or . not, thewords/Wibeingimperative. If this Avas the literal import of the word, the construction contended for would fall under the maxim, “ hmret v>% litera hmret im, cortiee y” because there is no reason for such a construction, and it is inconsistent with the general scope of the statute. But such is not the literal import of the word, — “ shall” is not used in the sense of a command, but as declaring a right. It is apparent the object of this rule was to give the right of representation to descendants, however remote, and the words are used in contrast to the statute of distributions which provides “ there shall be no representation admitted amongst collaterals after brothers’ and sisters’ children,” and the import of this rule of descent is, “ the right of representation shall be admitted in infinitum.”
The idea that a person who is entitled to a share of an estate, as one of the next collateral relations on his own footing, must represent his ancestor and take, not the share to which he is so entitled on his own footing, but that to which his ancestor would (if living) have been entitled, can only be supported on the ground that “ representation” is an' “ obligation” andnot a right.
That representation is bright, andnot an obligation, is manifest from any book treating on the subject that has ever been published, either in England or America.. In the English books, representation is put on the ground that the offspring of one ought to be allowed to take the share that his ancestor (if living) would have taken, BlackstoneB. 2, page 219 — “ The same right of representation,” &c.: “ yet this right does not appear to have been thoroughly established in the time of Henry 2nd, when Glanville wrote.” .The idea that representation is an obligation imposed by law upon those who are entitled on their own footing, is new, and the expression, the “ obligation of representation” isbynomeansafamiliarone. So (as I conceive) this reply to the position taken by me,, has no sufficient ground to support it.
But the reply in the second place is,' “ we derive our laws from those of Englandit is well settled there, that real estate descends “per stirpes,” and according to that mode of descent *100 the estate in controversy, must be divided into two equal parts, of which the child of Adam takes one part, and the adoption by the Act of 1808, as one of our rules of descent of the English canon in reference to representation in almost its very words, although it may be inconsistent with the general intent as evinced by the other rules, is .obligatory upon the Courts, and we are forced, although it may be against the reason of the thing, to put the same construction upon these same words, as had been before put upon them by the English Courts. This is the point upon which the question rests.
I admit that, if the rule in regard to representation was expressed in direct terms, so as not to admit of any construction other than that positively exjuessed by its terms, this Court Would be bound by it, although it should be of opinion that the law, as so expressed, was inconsistent with the general scope of the other rules in the statute. For instance, if the the 6th English canon had been retained, “ the collateral heir of the person last seized, must be his next collateral kinsman of the whole blood,” there would have been no room for construction ; and although such a rule was inconsistent with the general scope of the statute, and in the opinion of the Court the reasons upon which it had been originally adopted had ceased, still the Court would be bound to carry it into effect.
But the rule in regard to representation is not expressed in direct and positive terms; on the contrary, it is expressed in general terms, and requires a resort to construction in order to give it any meaning at all; in fact the only meaning that can be given to it depends upon the other rules with which it must be taken in connection. It was taken by the English Courts from the Roman law. Blackstone tells us that it was not fully established in the time of Henry II, when Glan-ville wrote.” As construed by the Roman jurists, the right of representation only applied when it was necessary to take the place of an ancestor, in order to be put on an equality with others who we re nearer in degree; and yet when it was finally adopted in England, although the same words are used to express it, the English Courts felt at liberty to put upon it a different construction, because of its connection with their *101 other canons of descent; and nevertheless, afterwards, in the statute of distributions, where the same law was adopted from the Romans in regard to personal property, the Courts also adopted the construction of the Romans, and not that which they had given to it in reference to real estate. Bladkstone accounts for this difference of construction in the following way: After saying that by the Roman law, land descends per capi-ta, except where it is necessary to resort to representation, he adds, “ this mode of representation is a necessary consequence of the double preference given by our law, first to the male issue, and next to the first born among the males, to both which the Roman law is a stranger: For, if all the children of three sisters were, in England, to claim per capita in thei'r own right, as next of ldn to their ancestor, without any respect to the stocks from whence they sprang, and those children were partly male and partly female, then the eldest male among them would exclude not only his own brothers and sisters, but all the issue of the other two daughters, or else the law in this instance must be inconsistent with itself, and depart from the preference which is constantly given to the males and the first born among persons in equal degree, whereas by dividing the inheritance according to the roots or stirpes, the rule of descent is kept uniform and steady: The issue of the eldest son excludes all other pretenders, as the son himself (if living) would have done; but the issue of two daughters divide the inheritance between them, provided their mothers, (if living) would have done the same; and among these several issues or representatives of the respective roots, the same preference to males and the same right of primogeniture obtain as would have obtained at the first among the roots themselves, the sons or daughters of the deceased.” Blackstone 2 B. Ch. “ descents” page 218. This (it seems to me) is conclusive of the question: it shows that the construction put on this canon by the English Courts was a consequence of its connection with the two ccmons, giving preference to males and to the eldest male. We have adopted the rule in reference to representation, in almost the same words in which it is expressed both in the Romanlaw and in the English law. Iiow can we adopt *102 the construction put upon it, in the latter, when, with us it is not connected with two canons like those of England, hut is connected with a canon abolishing these two canons, and announcing the very reverse of them to he the law of this State? Oessante rations eessat lex: and how can we refuse to put on it the construction that obtained in the former country, where, like with us, there was no feudal policy to prevent the application of the two general principies before stated? Neither the Boman law nor the English canon, nor our rule designates whcot ancestor the descendants are allowed to represent. Is it the father or the grand-father or the great grand-father ? This is left open and must be fixed by construction. The proper construction evidently is, “ that ancestor whom it is necessary for the descenda/nt to represent in order to prevent his exclusion from a sheere of the estate according to the other canons.”
If this case stood for decision in England, it is clear that the eldest son of the eldest brother would take the whole estate, or if he be dead, his only daughter or eldest son would take' the whole; for this peculiar English mode of representation has no application except wh&re the nernest of Mn are all females, as in case of deceased daughters or deceased sisters : our rules abolish the distinction between males and females. So if the English construction obtains here, it will not only apply to cases where the nearest of kin are all females as in England, but will apply to all cases, although as in our case, that of two deceased brothers, in England, it had no application. The result is that, contrary to the general scope and the particular intent of our Act of 1808, framed by a very wise man, after due consideration, the English construction is to prevail, nut only in cases where the nearest of kin are all females, but is to be extended to all cases whatever: and our rules, by which the preference of males and of the eldest son is abolished, (which constitute the only ground upon which the English construction of the canon, in reference to representation is based,) are to be so interpreted, as to extend the application of that mode of representation to cases, to which it does not apply in England.
The only thing that can be relied on, to give color to the po *103 sition that the English doctrine of descent per simpes obtains in this State, is a passage in Kent’s Commentaries in the lecture on descent, vol. 4th, page 391. After showing that, by the law of New York, those in equal degree, taken “joer capi-ta,” he says, “ Inheritance per stirpes is admitted when representation becomes necessary to prevent the exclusion of persons in a remote degree, but when they are in equal degree, as are, for instance, his grand-sons, representation is not necessary, and would occasion an unequal distribution of the estate, and they accordingly inherit per capita. This is the rule which prevails throughout the United States, with the exceptions of Rhode Island, North Carolina and (four other States,) and it agrees with the general rule of law in the distribution of personal property.” lie cites no case as authority for thus putting North Carolina in the unenviable position of being one of the very few States whose laws, as construed, occasion an unequal distribution, and conflict with the general principles founded on natural feeling, and we are left to conjecture that he adopted his conclusion hastily, from some general expressions used arguendo in Ward v. Stowe, 1 Dev. 67, decided 1826. The case turned upon the construction of the word “heirs” in a will: HeNdebsoN, Judge, uses the general expression that land descends per stirpes and not per capita, and says this was never doubted for a single moment as far as he can collect from authorities. Judge Kent’s 4th vol. was published shortly after this decision, and he adopted the general expression without noticing that its meaning was qualified and restrained by the instance given.' “ A has a daughter and two grand-daughters, daughters of a deceased daughter: his land descends one-half to his daughter and the other half to his two grand-daughters.” This case was overruled in 1834, 1 Dev. Eq. 509, but the question of descent per stirpes and per capita, was not involved in the decision. It is true, that in the instance, put by Judge Henderson, the grand-daughters take per simpes, and this falls precisely within the right of representation according to the second general principle above stated, because it was necessary for them to represent their mother in order to bring themselves up to an equality with *104 their aunt, so as to entitle themselves to a share of the estate: but it is very far from showing that in despite of our statute, abolishing the two English canons, we still sustain a doctrine which is based on them. The learned commentator evidently lost himself in the vast field over which he was.attempting to ■run. Nor is it a matter of surprise that there should be some inaccuracies and some conclusions hastily drawn by an author who attempts, in a single lecture of some fifty pages, to give the law of descents in the State of New York, to which his attention is particularly directed, and the law of the Jews, and the Athenians, Romans, Arabs, Gentoos, and also the law of descents in England, Prance, Spain, Germany, and all of the several States of this Union. Indeed, it is doing injustice to the memory of that very learned man to suppose that he ever expected that such general statements, made by him for the sake of illustrating the subject upon which his attention was particularly fixed, would ever be cited as an authority to show the law of any State save that of New York.
It remains only to make an application of the construction fixed on, to the case before us, by way of further illustration of the subject.
The descendants of the deceased children of Henry have the right of representation, because otherwise they would be excluded, not being in equal degree with their uncle and aunts, and their cousin, the daughter of Adam. Their parents are the “ ancestors” to be represented, because it is necessary for their descendants to represent them in order to gain an equality with the next collateral relations, and thereby entitle themselves to a share of the estate; by so doing, they take as “ classes,” one-seventh part respectively, but there is no necessity for them to go higher and represent their grand-father: so he is not the ancestor to be represented, and there is no reason, according to our rule, why they should be reqm/red to make this double representation, first of their parents, and then of their grand-father, and take a twelfth instead of a seventh part of the estate.
The two children of Henry who are living, are “ next collateral relations” and as such, are each entitled to a share in their *105 own right', there is no necessity for them to represent any one, so there is no ancestor of theirs to be represented; they each take a share under the 4th and 5th rules — the nephew talcing subject to the right of the female and younger children, and all taking subject to the rights of the descendants of their deceased brothers and sisters under the 3rd rule. Thus each takes a seventh part, and no reason is suggested why they -should be required to represent their father and take only one' twelfth part.
The daughter of Adam is entitled to a share in her own right as a next collateral relation, subject to the 2nd and 3rd rales as above stated, that is one-seventh part. No reason can be conceived, under our rules, why it should have been the intention of the law-makers to require her to represent her father and take one-half of the whole estate.
Suppose the daughter of Adam had died leaving a child, under the 3rd rule it would have the right to represent its mother and take a seventh part, but can it be supposed that it was the intention of the law-makers to require the child to represent its grand-father and take half?
The acts of 1784 and 1795, which are pressed into the argument, have (as I conceive) no bearing on the question — the act of 1808 expressly supersedes all prior legislation, and the words “ If any brother or sister of the intestate shall have died in the life-time of the intestate leaving issue, such issue shall represent the deceased parent, &c., and shall be entitled to the part of the estate of his or their uncle or aunt, as his or their father or mother would have been entitled, to if living,” &c., are fully satisfied by giving to them the effect of preventing a liming brother or sister from excluding the issue of a deceased brother or sister; there is no authority or reason for extending this application so as to produce inequality among those who are in equal degree and may claim, in their own right, as next collateral relations.